contained and/or was caused to contain a foreign substance of green/blue/bluish-green specks/pellets, to wit: Brodifacoum—commonly known as and referred to as rat poison, rodentcide, and/or an anticoagulant poison which is commonly marketed under a large variety of trade names including but not limited to: Pestoff, Ratak+, Rodend, Mouser Rodenthor and Ratsak—which, in turn, directly and proximately caused Plaintiffs to sustain and suffer serious personal, physical and emotional/psychological injuries and damages including, but not limited to: nausea, vomiting, vomiting blood, coughing up blood, diarrhea, diarrhea with blood, stomach pains, chest pains, difficulty bleeding, headaches, pains to the head, pain, dizziness, light-headedness, gastrointestinal/digestive problems/complications, dehydration, nose bleeds, internal stomach bleeding, stomach cramps, fatigue, sweating, spitting up blood, foaming of the mouth, fever/feeling of body being hot, fainting, breathing heavily, fear of death, fear of life-threatening injuries, emotional distress, mental anguish, pain and suffering, shock, fear, anxiety, passing gas, dry heaving, migraines, low blood count and related damages and injuries herein. *Annexed hereto and made a part hereof as Exhibit "A" is a copy of the independent laboratory testing of the contaminated food served to Plaintiffs, the results of same and pictures of the samples tested.*

169.    That the actions of all of the Defendants were intentional, malicious, reckless, wanton and egregious, giving rise to punitive damages as against all Defendants with the exception of the municipality.

PLAINTIFF TROY SIDDONS:

170.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff TROY SIDDONS was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

171.    That on March 3, 2015, Plaintiff TROY SIDDONS, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

172.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff TROY SIDDONS, by the Defendants in their respective cells and, as such, Plaintiff TROY SIDDONS was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff TROY SIDDONS on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

173.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TROY SIDDONS, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff TROY SIDDONS in said Plaintiff's respective cell.

174.    That on March 3, 2015, Plaintiff TROY SIDDONS received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, vegetables and/or juice and consumed/ate same.

175.    That on March 3, 2015 and continuing, after Plaintiff TROY SIDDONS consumed/ate the majority of the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TROY SIDDONS, to wit: meatloaf, bread, cabbage, vegetables and/or juice, Plaintiff TROY SIDDONS became ill/sick and, when he looked at the remnants of the foregoing lunch in the tray he was served/provided by Defendants, he saw bluish-green pellets in the meatloaf and mixed in

amongst the vegetables/cabbage and immediately called for Defendant Campbell, the Correction Officer assigned to/on duty for the Plaintiffs' housing area in AMKC when the foregoing lunch was served and the Correction Officer who assisted in serving the Plaintiffs, including Plaintiff TROY SIDDONS with the March 3, 2015 lunch trays consisting of the foregoing meatloaf, bread, vegetables, cabbage and/or juice.

176.    That on March 3, 2015, Plaintiff TROY SIDDONS, as well as other Plaintiffs herein, showed Defendant Campbell the foregoing lunch/food/meal consisting of meatloaf, vegetables, cabbage and/or juice and Defendant Campbell stated to Plaintiff TROY SIDDONS and to other Plaintiffs herein after viewing same that same food was contaminated.

177.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff TROY SIDDONS consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TROY SIDDONS, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff TROY SIDDONS in said Plaintiff's respective cell, Plaintiff TROY SIDDONS sustained and suffered serious personal and physical injuries including, but not limited to: vomiting, vomiting up blood, his body becoming hot, nausea, felling "high", fever, headaches, stomach pain, fainting, passing out, weakness, pain, loss of consciousness, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

178.    That on March 3, 2015, and continuing and at all relevant times herein mentioned, Plaintiff TROY SIDDONS, also showed the foregoing lunch meal/food to Defendant Johnson who also agreed, after viewing same, that something was wrong in/with the food.

179.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff TROY SIDDONS, after eating/consuming the foregoing contaminated lunch meal/food

and after becoming seriously ill from same, including but not limited to vomiting and vomiting up blood, repeatedly requested of Defendants Campbell and Johnson to go to "medical" so that he could be examined, tested, and treated for whatever this contaminant in the foregoing lunch meal/food was and in order to determine what the contaminant was so as to receive the proper, timely and required medical care/treatment for same.

180.     That on March 3, 2015, and continuing, and at all relevant times herein mentioned, after Plaintiff TROY SIDDONS's repeated demand to go to "medical", Plaintiff TROY SIDDONS was eventually brought to Defendant, the AMKC Medical Clinic/Facility where, while Defendants Campbell and Johnson kept Plaintiff in the "pens"/cell in medical, Plaintiff TROY SIDDONS again vomited/vomited up blood and also fainted.

181.     That on March 3, 2015, Plaintiff TROY SIDDONS, while at Defendant AMKC Medical Clinic/Facility, showed the medical staff, medical personnel, medical employees, doctors and nurses the foregoing contaminated food and, in response to same, one of Defendants' nurses, whose name is unknown to Plaintiff but known to the Defendants, stated to Plaintiff TROY SIDDONS that what was in the food was rat poison; this nurse also telling Plaintiff TROY SIDDONS that she feared losing her job if she were to confirm to anyone else that the food was contaminated with rat poison.

182.     That on March 3, 2015, while Plaintiff TROY SIDDONS was at/in Defendant AMKC Medical Clinic, Plaintiff was seen by a doctor with an accent who told Plaintiff his blood pressure and vitals were fine, gave him a white liquid to drink and was sending Plaintiff back to his cell in the housing area of AMKC despite knowing and seeing Plaintiff vomiting, vomiting up blood, losing consciousness and fainting requiring Plaintiff TROY SIDDONS to be placed on a stretcher and to be brought back to consciousness with ammonia.

183.   That on March 3, 2015 and continuing, and at all relevant times herein mentioned, while Plaintiff TROY SIDDONS was at/in Defendant AMKC Medical Clinic and was seen by a doctor with an accent, whose name is unknown to Plaintiff but known to Defendants who told Plaintiff his blood pressure and vitals were fine and was sending Plaintiff back to his cell in the housing area of AMKC despite knowing and seeing Plaintiff vomiting, vomiting up blood, losing consciousness and fainting requiring Plaintiff TROY SIDDONS to be placed on a stretcher and to be brought back to consciousness with ammonia, Plaintiff TROY SIDDONS repeatedly requested of the doctor with the accent, of the nurses and of Defendants Campbell, Wilson and Johnson that he not be sent back to his cell, that he be treated at the AMKC Medical Clinic/Facility, that his urine and blood be tested and that he be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same.

183.   That on March 3, 2015, and continuing, and at all relevant times herein mentioned, despite Plaintiff TROY SIDDONS's foregoing repeated requests not be sent back to his cell, that he be treated at the AMKC Medical Clinic/Facility, that his urine and blood be tested and that he be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same, the Defendants including Defendants Campbell, Wilson, Johnson and the doctor with an accent and nurses at the AMKC Medical Clinic/Facility denied each and every one of Plaintiff's foregoing requests for medical care/treatment.

184.   That as Plaintiff TROY SIDDONS was continuing to feel sick and ill, including, but not limited to suffering from headaches and stomach pains for several days after the March 3,

2015 consumption of the rat poison, and as it was still not yet determined, discovered or even tested by Defendants as to the identity of the contaminant that was causing him to be sick and ill, Plaintiff TROY SIDDONS, from March 3, 2015 and continuing for days thereafter, repeatedly demanded to be placed on/requested/logged in for "sick call" so that he could be medically treated but the Defendants repeatedly denied same despite Plaintiffs' serious medical conditions/ailments of which the Defendants were aware.

185.    That as a result of the Defendants' denying Plaintiff TROY SIDDONS's repeated requests for medical care for consuming the contaminated food that the Defendants served to him on March 3, 2015, Plaintiff TROY SIDDONS registered a complaint/filed a grievance with Prisoners' Rights.

186.    That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff TROY SIDDONS was forced to only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

187.    That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff TROY SIDDONS knew that the kitchen pantry officer for Plaintiff's housing area in AMKC, to wit: 12 upper, was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area of 12 upper was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates from 12 upper. Rather, on March 3, 2015, for the foregoing lunch meal/food that was served to Plaintiffs on same date, Defendant

Thomas had two Spanish inmates from another housing area/unit of AMKC to assist her with the preparation, plating and distribution of the food/meals/lunch on March 3, 2015 that was served, handed out, cooked, prepared, plated and handed out to Plaintiffs to eat on same March 3, 2015.

188.     That on March 3, 2015, prior to the Plaintiffs being served the foregoing contaminated food/lunch/meal on same date, Defendant Thomas engaged in a verbal fight with other inmates from Plaintiffs' housing area, none of those involved in same were any of the Plaintiffs herein, and, right as dinner was being served by Defendant Thomas on same date of March 3, 2015, Defendant Thomas stated to the Plaintiffs and the other inmates of 12 upper, with a sense of self satisfaction, in sum and substance, that they are mad because they got sick from the foregoing contaminated lunch of same date.

189.     That it is Plaintiff TROY SIDDONS's understanding that the only individuals to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas and the two Spanish inmates she picked to assist her with same.

190.     That, upon information and belief, approximately four to five days after this March 3, 2015 incident, Defendant Feeney came to AMKC and met with some of the Plaintiffs who gave her a sample of the contaminated food so that the Defendants could test same.

191.     That from March 3, 2015 and continuing, some of the Plaintiffs including Plaintiff TROY SIDDONS saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

192.     That on March 14, 2015, after Defendant Feeney had confirmed with the Court that she had received a sample of the foregoing contaminated food and that she observed same to contain blue-green pellets and that same sample would be tested by the Defendants, Plaintiff

TROY SIDDONS gave the remaining sample of his contaminated food/lunch that was served to him and that he consumed on March 3, 2015 to be tested by an independent outside laboratory.

193.    That to date, Plaintiff TROY SIDDONS is aware that this foregoing sample of his contaminated food was, in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

194.    That to date, it is Plaintiff TROY SIDDONS's understanding that the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

195.    That to date, Plaintiff TROY SIDDONS requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

196.    That as Plaintiff TROY SIDDONS was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

197.    That as a direct and proximate result of the foregoing, Plaintiff TROY SIDDONS sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, vomiting, vomiting up blood, his body becoming hot, nausea, felling "high", fever, headaches, stomach pain, fainting, passing out, weakness, pain, loss of consciousness, mental anguish, shock, fear, emotional distress

(intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

198.     That as a direct and proximate result of the foregoing, Plaintiff TROY SIDDONS claims damages herein.

PLAINTIFF TERRENCE PAYNE:

199.     That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff TERRENCE PAYNE was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

200.     That on March 3, 2015, Plaintiff TERRENCE PAYNE, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

201.     That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff TERRENCE PAYNE, by the Defendants in their respective cells and, as such, Plaintiff TERRENCE PAYNE was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff TERRENCE PAYNE on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

202.     That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TERRENCE PAYNE, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff TERRENCE PAYNE in said Plaintiff's respective cell.

203.    That on March 3, 2015, Plaintiff TERRENCE PAYNE received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served on a cart by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, corn and/or juice and consumed/ate same.

204.    That on March 3, 2015 and continuing, Plaintiff TERRENCE PAYNE consumed/ate approximately half of the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TERRENCE PAYNE, to wit: meatloaf, bread, cabbage, corn and/or juice and, while eating same, Plaintiff TERRENCE PAYNE looked at the remnants of the foregoing lunch in the tray he was served/provided by Defendants and saw green-blue specks in same.

205.    That on March 3, 2015, while Plaintiff TERRENCE PAYNE was eating/consuming the foregoing lunch/meal, he heard other inmates including some of the other Plaintiffs herein, complaining about said lunch/food stating that something was in the food, as well as hearing other inmates including some of the other Plaintiffs herein throwing up, and, as a result of same, Plaintiff TERRENCE PAYNE looked at the remnants of the foregoing lunch in the tray he was served/provided by Defendants and saw green-blue specks and/or blue-green balls in the meatloaf, cabbage and corn that Defendants served to him for consumption.

206.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff TERRENCE PAYNE consuming the foregoing lunch/meal that contained the blue-green specks/balls, Plaintiff TERRENCE PAYNE, approximately twenty to thirty minutes after consuming same, Plaintiff TERRENCE PAYNE became seriously ill and sick and suffered ailments/medical conditions including, but not limited to: fainting, passing out, losing consciousness, hitting/striking his head and face from fainting/passing out, blurry eyes and loss of appetite.

207.   That on March 3, 2015 and at all relevant times herein mentioned, Defendant Campbell was the "floor officer" for Plaintiffs' housing area/unit in AMKC.

208.   That on March 3, 2015, after Plaintiff TERRENE PAYNE consumed the foregoing lunch/meal and suffered from medical conditions/ailments including, but not limited to, fainting, Plaintiff TERRENCE PAYNE awoke in the "emergency clinic".

209.   That on March 3, 2015, while Plaintiff TERRENCE PAYNE was in the "emergency clinic", Plaintiff told the nurses about the foregoing contaminated lunch/meal that had blue-green specks/balls and of the other inmates getting sick and they told Plaintiff, in sum and substance, that they knew what was going on.

210.   That on March 3, 2015, while Plaintiff TERRENCE PAYNE was in the "emergency clinic" after he fainted and hit his head and face after consuming the foregoing contaminated food, no doctor ever saw, assessed, evaluated, tested, examined or treated Plaintiff and Plaintiff was merely given water and had his temperature and heart "checked" and was sent back to his housing area/cell.

211.   That it is Plaintiff TERRENCE PAYNE's understanding that other inmates including some of the other Plaintiffs named herein, showed Defendant Campbell the foregoing contaminated lunch/food from their respective trays.

212.   That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff TERRENCE PAYNE consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TERRENCE PAYNE, to wit: meatloaf, bread, cabbage, corn and/or juice that was provided and served to Plaintiff TERRENE PAYNE in said Plaintiff's respective cell, Plaintiff TERRENCE PAYNE sustained and suffered serious personal and physical injuries including, but not limited to: fainting, passing out, losing consciousness,

hitting/striking his head and face from fainting/passing out, blurry eyes, loss of appetite, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

213.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, Plaintiff TERRENCE PAYNE made repeated requests for medical care and treatment including but not limited to: being placed on sick call, medical testing to determine what was the contaminant n the foregoing lunch/food so as to determine the proper medical care to then be provided, testing of Plaintiff's blood and/or urine to identify what the contaminant was, and/or to be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiffs' requests and despite knowing that Plaintiff TERRENCE PAYNE fainted, lost consciousness, passed out and hit his face and head after consuming the contaminated food, the Defendants denied/refused same.

214.    That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff TERRENCE PAYNE was forced to only eat sealed food and/or food from commissary such as chips and other "junk food" as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

215.    That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff TERRENCE PAYNE knew that the kitchen pantry officer for Plaintiff's housing area in AMKC was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing

area was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates.

216. That on March 3, 2015, Plaintiff TERRENCE PAYNE saw Defendant Thomas wheel in the cart of food carrying the trays of the foregoing contaminated food/lunch that was distributed and served to the Plaintiffs herein to consume and eat on same date of March 3, 2015.

217. That prior to March 3, 2015, as Plaintiff TERRENCE PAYNE was new to being housed in AMKC, Plaintiff learned from other inmates in his housing area/unit that Defendant Thomas does not like their housing area/unit and is always verbally fighting with the inmates.

218. That it is Plaintiff TERRENCE PAYNE''s understanding that the only individual to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas.

219. That approximately three days after this March 3, 2015 incident, Defendant Feeney came to AMKC and met with Plaintiff TERRENCE PAYNE who gave Defendant Feeney a sample of his contaminated food so that the Defendants could test same.

220. That from March 3, 2015 and continuing, some of the Plaintiffs including Plaintiff TERRENCE PAYNE saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

221. That it is Plaintiff TERRENCE PAYNE's understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

222.    That to date, it is Plaintiff TERRENCE PAYNE's understanding that the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

223.    That to date, Plaintiff TERRENCE PAYNE requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

224.    That as Plaintiff TERRENCE PAYNE was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

225.    That as a direct and proximate result of the foregoing, Plaintiff TERRENCE PAYNE sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, fainting, loss of consciousness, passing out, hitting/striking his face and head, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

226.    That as a direct and proximate result of the foregoing, Plaintiff TERRENCE PAYNE claims damages herein.

PLAINTIFF PETER SPRAUVE:

227.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff PETER SPRAUVE was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

228.    That on March 3, 2015, Plaintiff PETER SPRAUVE, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

229.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff PETER SPRAUVE, by the Defendants in their respective cells and, as such, Plaintiff PETER SPRAUVE was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff PETER SPRAUVE on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

230.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff PETER SPRAUVE, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff PETER SPRAUVE in said Plaintiff's respective cell.

231.    That on March 3, 2015, Plaintiff PETER SPRAUVE received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served on a cart by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, corn and/or juice and consumed/ate same.

232.    That on March 3, 2015 and continuing, Plaintiff PETER SPRAIVE consumed/ate the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed,

provided and served by Defendants to Plaintiff PETER SPRAUVE, to wit: meatloaf, bread, cabbage, corn and/or juice and saw greenish-blue pellets in same.

233. That on March 3, 2015, while Plaintiff PETER SPRAUVE ate/consumed the foregoing lunch/meal, he heard other inmates including some of the other Plaintiffs herein, complaining about said lunch/food and becoming sick from same.

234. That on March 3, 2015, and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff PETER SPRAUVE consuming/eating the foregoing lunch/meal that contained the greenish-blue pellets, Plaintiff PETER SPRAUVE became seriously ill and sick and suffered ailments/medical conditions including, but not limited to: nausea, vomiting, dizziness, pains, stomach pains, diarrhea and/or weakness.

235. That on March 3, 2015 and at all relevant times herein mentioned, Defendant Campbell was the "floor officer" for Plaintiffs' housing area/unit in AMKC.

236. That it is Plaintiff PETER SPRAUVE's understanding that other inmates including some of the other Plaintiffs named herein, showed Defendant Campbell the foregoing contaminated lunch/food from their respective trays.

237. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff PETER SPRAUVE consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff PETER SPRAUVE, to wit: meatloaf, bread, cabbage, corn and/or juice that was provided and served to Plaintiff PETER SPRAUVE in said Plaintiff's respective cell, Plaintiff PETER SPRAUVE sustained and suffered serious personal and physical injuries including, but not limited to: nausea, vomiting, dizziness, pains, stomach pains, diarrhea, weakness, mental anguish, shock, fear, emotional distress (intentional and

negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

238.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, Plaintiff PETER SPRAUVE made repeated requests for medical care and treatment including but not limited to: being placed on sick call, medical testing to determine what was the contaminant n the foregoing lunch/food so as to determine the proper medical care to then be provided, testing of Plaintiff's blood and/or urine to identify what the contaminant was, and/or to be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiffs' requests and despite knowing that Plaintiff PETER SPRAUVE became seriously ill including but not limited to: nausea, vomiting, dizziness, pains, stomach pains, diarrhea and/or weakness after consuming the contaminated food, the Defendants denied/refused same.

239.    That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff PETER SPRAUVE was forced to only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

240.    That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff PETER SPRAUVE knew that the kitchen pantry officer for Plaintiff's housing area in AMKC was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area was allowed to assist Defendant Thomas, as would normally be the practice, custom and

policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates.

241.    That on March 3, 2015, Plaintiff PETER SPARUVE knew that it was Defendant Thomas who wheeled in the cart of food carrying the trays of the foregoing contaminated food/lunch that was distributed and served to the Plaintiffs herein to consume and eat on same date of March 3, 2015.

242.    That prior to and on March 3, 2015, Plaintiff PETER SPRAUVE knew and/or learned from other inmates in his housing area/unit that Defendant Thomas does not like their housing area/unit and is always verbally fighting with the inmates.

243.    That it is Plaintiff PETER SPRAUVE''s understanding that the only individual to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas.

244.    That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

245.    That it is Plaintiff PETER SPRAUVE's understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra.*

246.    That to date, it is Plaintiff PETER SPRAUVE's understanding that other Plaintiffs provided Defendant Feeney with a sample of their respective contaminated food for the Defendants to test same and that the sample provided to and possessed by Defendant Feeney has

yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

247.    That to date, Plaintiff PETER SPRAUVE requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

248.    That as Plaintiff PETER SPRAUVE was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

249.    That as a direct and proximate result of the foregoing, Plaintiff PETER SPRAUVE sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, nausea, vomiting, dizziness, pains, stomach pains, diarrhea, weakness, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and/or denial of proper, timely and/or adequate medical care and treatment.

250.    That as a direct and proximate result of the foregoing, Plaintiff PETER SPRAUVE claims damages herein.

PLAINTIFF QUINCY PALMER:

251.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff QUINCY PALMER was incarcerated with/in the New York City Department of

Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

252. That on March 3, 2015, Plaintiff QUINCY PALMER, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

253. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff QUINCY PALMER, by the Defendants in their respective cells and, as such, Plaintiff QUINCY PALMER was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff QUINCY PALMER on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

254. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff QUINCY PALMER, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff QUINCY PALMER in said Plaintiff's respective cell.

255. That on March 3, 2015, Plaintiff QUINCY PALMER received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served on a cart by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, corn and/or juice and consumed/ate approximately all of same.

256. That on March 3, 2015 and continuing, Plaintiff QUINCY PALMER consumed/ate approximately all of the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff QUINCY PALMER, to wit: meatloaf, bread, cabbage, corn and/or juice and, after eating/consuming same,

became seriously ill including, but not limited to: stomach pain, stomach feeling like it was on "f…..ing fire", stomach cramps, vomiting, diarrhea and painful gaseous feelings.

257.    That on March 3, 2015, while Plaintiff QUINCY PALMER was eating/consuming the foregoing lunch/meal and became ill, he heard other inmates including some of the other Plaintiffs herein, complaining about said lunch/food stating that something was in the food and viewed the food of some of the other Plaintiffs herein and saw green-blue pellets in same.

258.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff QUINCY PALMER consuming the foregoing lunch/meal that contained the green-blue pellets, Plaintiff QUINCY PALMER became seriously ill and sick and suffered ailments/medical conditions including, but not limited to: stomach pain, stomach feeling like it was on "f…..ing fire", stomach cramps, vomiting, diarrhea and painful gaseous feelings.

259.    That on March 3, 2015 and at all relevant times herein mentioned, Defendant Campbell was the "floor officer" for Plaintiffs' housing area/unit in AMKC.

260.    That it is Plaintiff QUINCY PALMER's understanding that other inmates including some of the other Plaintiffs named herein, showed Defendant Campbell the foregoing contaminated lunch/food from their respective trays.

261.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff QUINCY PALMER consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff QUINCY PALMER, to wit: meatloaf, bread, cabbage, corn and/or juice that was provided and served to Plaintiff QUINCY PALMER in said Plaintiff's respective cell, Plaintiff QUINCY PALMER sustained and suffered serious personal

and physical injuries including, but not limited to: stomach pain, stomach feeling like it was on "f…..ing fire", stomach cramps, vomiting, diarrhea, painful gaseous feelings, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

262.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff QUINCY PALMER, after consuming/eating the contaminated lunch/food served to him by Defendants and after becoming seriously ill including, but not limited to: stomach pain, stomach feeling like it was on "f…..ing fire", stomach cramps, vomiting, diarrhea, painful gaseous feelings, notified Defendant Campbell of same and requested to immediately go to the medical clinic to be tested and treated for same.

263.    That on March 3, 2015, after waiting approximately six to seven hours after Plaintiff QUINCY PALMER consumed/ate the contaminated lunch/food served to him by Defendants, after becoming seriously ill including, but not limited to: stomach pain, stomach feeling like it was on "f…..ing fire", stomach cramps, vomiting, diarrhea, painful gaseous feelings, after notifying Defendant Campbell of same and requesting to immediately go to the medical clinic to be tested and treated for same, Plaintiff QUINCY PALMER was eventually brought to the AMKC Medical Clinic/Facility where, despite knowing of the consumption of the contaminated food and subsequent illnesses he suffered including, but not limited to: stomach pain, stomach feeling like it was on "f…..ing fire", stomach cramps, vomiting, diarrhea, painful gaseous feelings, the doctor and nurses at AMKC Medical Clinic merely took his vitals and gave him what he was told to be Mylanta which, in turn, after drinking same, made his ailments/medical conditions worse.  That Plaintiff QUINCY PALMER requested that they test his blood or urine to determine what the contaminant was that he consumed and caused him to be seriously ill but they refused and sent him back to his cell.

264. That the next day, on March 4, 2015, Plaintiff QUINCY PALMER requested to go to "medical" and, when he was brought back to the AMKC Medical Clinic, he requested that his blood and/or urine be tested as he continued to be ill and continued to suffer from diarrhea and stomach pains/cramps but they refused to test same.

265. That as a result of the Defendants' serving him contaminated food and then denying Plaintiff QUINCY PALMER's repeated requests for medical care for consuming the contaminated food that the Defendants served to him on March 3, 2015, Plaintiff QUINCY PALMER registered a complaint/filed a grievance with the Inmates' Delegate/Delegation.

266. That on March 3, 2015, and continuing, and at all relevant times herein mentioned, Plaintiff QUINCY PALMER made repeated requests for medical care and treatment including but not limited to: being placed on sick call, medical testing to determine what was the contaminant n the foregoing lunch/food so as to determine the proper medical care to then be provided, testing of Plaintiff's blood and/or urine to identify what the contaminant was, and/or to be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiffs' requests and despite knowing that Plaintiff QUINCY PALMER suffered from stomach cramps, vomiting, diarrhea, painful gaseous feelings and continued to suffer from same, the Defendants denied/refused same.

267. That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff QUINCY PALMER was forced to only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

268.     That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff QUINCY PALMER knew that the kitchen pantry officer for Plaintiff's housing area in AMKC was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates.

269.     That on March 3, 2015, Plaintiff QUINCY PALMER knew and/or learned that it was Defendant Thomas who wheeled in the cart of food carrying the trays of the foregoing contaminated food/lunch that was distributed and served to the Plaintiffs herein to consume and eat on same date of March 3, 2015.

270.     That prior to March 3, 2015, Plaintiff QUINCY PALMER knew and/or learned from other inmates in his housing area/unit that Defendant Thomas does not like their housing area/unit and is always verbally fighting with the inmates.

271.     That it is Plaintiff QUINCY PALMER's understanding that the only individual to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas.

272.     That subsequent to this March 3, 2015 incident, Plaintiff QUINCY PALMER saw Defendant Feeney come to AMKC and meet with some of the Plaintiffs herein to interview them and learned that some of the Plaintiffs gave Defendant Feeney samples of the contaminated food/lunch so that the Defendants could test same.

273.     That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015

incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

274.    That it is Plaintiff QUINCY PALMER's understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

275.    That to date, it is Plaintiff QUINCY PALMER's understanding that the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

276.    That to date, Plaintiff QUINCY PALMER requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

277.    That as Plaintiff QUINCY PALMER was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

278.    That as a direct and proximate result of the foregoing, Plaintiff QUINCY PALMER sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, stomach pain, stomach feeling like it was on "f…..ing fire", stomach cramps, vomiting, diarrhea, painful gaseous

feelings, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

279.    That as a direct and proximate result of the foregoing, Plaintiff QUINCY PALMER claims damages herein.

PLAINTIFF JOSEPH JOHNSON:

280.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff JOSEPH JOHNSON was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

281.    That on March 3, 2015, Plaintiff JOSEPH JOHNSON, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

282.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff JOSPEH JOHNSON, by the Defendants in their respective cells and, as such, Plaintiff JOSEPH JOHNSON was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff JOSEPH JOHNSON on March 3, 2015, to wit: meatloaf, bread, corn, cabbage and/or juice.

283.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff JOSEPH JOHNSON, to wit: meatloaf, bread, cabbage, corn and/or juice was provided and served to Plaintiff JOSEPH JOHNSON in said Plaintiff's respective cell.

284. That on March 3, 2015, Plaintiff JOSPEH JOHNSON received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, corn and/or juice and consumed/ate same.

285. That on March 3, 2015 and continuing, after Plaintiff JOSEPH JOHNSON consumed/ate between approximately half to all of the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff JOSEPH JOHNSON, to wit: meatloaf, bread, cabbage, corn, and/or juice, Plaintiff JOSEPH JOHNSON became ill/sick and, when he looked at the remnants of the foregoing lunch in the tray he was served/provided by Defendants, he saw a green substance/pellets in the corn. As the food tasted bitter, "funny" and "powdery", Plaintiff pushed the tray and what was leftover in said tray out of his cell.

286. That it is Plaintiff JOSEPH JOHNSON's understanding that some of the Plaintiffs herein showed Defendant Campbell the foregoing lunch/food/meal consisting of meatloaf, vegetables, corn, cabbage and/or juice and Defendant Campbell stated to them that he, Defendant Campbell, after viewing same, believed that same food was contaminated.

287. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff JOSPEH JOHNSON consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TROY SIDDONS, to wit: meatloaf, bread, cabbage, corn and/or juice was provided and served to Plaintiff JOSEPH JOHNSON in said Plaintiff's respective cell, Plaintiff JOSEPH JOHNSON sustained and suffered serious personal and physical injuries including, but not limited to: dizziness, foaming at the mouth, mouth watering, stomach pains/cramps, vomiting, lightheadedness, diarrhea, nosebleeds, headaches, mental

anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

288.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff JOSEPH JOHNSON, after eating/consuming the foregoing contaminated lunch meal/food and after becoming seriously ill from same, including but not limited to: dizziness, foaming at the mouth, mouth watering, stomach pains/cramps, vomiting, lightheadedness, diarrhea, nosebleeds, headaches, requested to go to "medical" so that he could be examined, tested, and treated for whatever this contaminant in the foregoing lunch meal/food was and in order to determine what the contaminant was so as to receive the proper, timely and required medical care/treatment for same.

289.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, after Plaintiff JOSEPH JOHNSON's repeated demand to go to "medical", Plaintiff JOSEPH JOHNSON was eventually brought to Defendant, the AMKC Medical Clinic/Facility approximately five to six hours later where the doctor, Defendant Doctor Park refused to speak with the affected inmates like Plaintiff and where the AMKC Medical Clinic doctor, an African doctor whose name is unknown to Plaintiff but known to the Defendants, and nurses merely checked Plaintiff's blood pressure and heart, gave him Mylanta to drink, told him it was just an upset stomach/stomach virus and sent him back to his cell.

290.    That on March 3, 2015 when Plaintiff JOSEPH JOHNOSN was in the AMKC Medical Clinic/Facility, Plaintiff JOSEPH JOHNSON requested that his blood and/or urine be tested in order to determine what the contaminant was in the food that caused him to become seriously ill and so that, once the identity of same was determined, Plaintiff could receive the timely, proper and/or adequate medical care and treatment to treat same.

291. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, despite Plaintiff JOSEPH JOHNSON's requests to have his blood and/or urine tested, the AMKC Medical Clinic/Facility and its doctor and nurses refused and denied him same.

292. That as Plaintiff JOSEPH JOHNSON was continuing to feel sick and ill, including, but not limited to continuing to suffer from: nosebleeds, vomiting, headaches and diarrhea for several days after the March 3, 2015 consumption of the rat poison, and as it was still not yet determined, discovered or even tested by Defendants as to the identity of the contaminant that was causing him to be sick and ill, Plaintiff JOSEPH JOHNSON, from March 3, 2015 and continuing for days thereafter, repeatedly demanded to be placed on/requested/logged in for "sick call", requested to go to "medical", requested that his blood and/or urine be tested and requested to be transported to an outside hospital/facility to receive the proper and/or adequate medical testing and treatment but, despite said repeated requests, the Defendants repeatedly denied same despite Plaintiffs' serious medical conditions/ailments of which the Defendants were aware.

293. That as a result of the Defendants' denying Plaintiff JOSEPH JOHNSON's repeated requests for medical care for consuming the contaminated food that the Defendants served to him on March 3, 2015, Plaintiff JOSEPH JOHNSON registered a complaint/filed a grievance asking for, among other things, medical care and Kosher/sealed meals. That despite his foregoing request/grievance, Plaintiff JOSEPH JOHNSON did not receive any response thereto.

294. That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff JOSEPH JOHNSON was forced to only eat sealed food and/or food from commissary as he feared eating any food

cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

295.    That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff JOSEPH JOHNSON knew that the kitchen pantry officer for Plaintiff's housing area in AMKC, to wit: 12 upper, was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area of 12 upper was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates from 12 upper. Rather, on March 3, 2015, for the foregoing lunch meal/food that was served to Plaintiffs on same date, Defendant Thomas had two Spanish inmates from another housing area/unit of AMKC, upon information and belief from 11 upper, to assist her with the preparation, plating and distribution of the food/meals/lunch on March 3, 2015 that was served, handed out, cooked, prepared, plated and handed out to Plaintiffs to eat on same March 3, 2015.

296.    That on March 3, 2015, prior to the Plaintiffs being served the foregoing contaminated food/lunch/meal on same date, Defendant Thomas engaged in a verbal fight with other inmates from Plaintiffs' housing area, none of those involved in same were any of the Plaintiffs herein, and, right as dinner was being served by Defendant Thomas on same date of March 3, 2015, Defendant Thomas again engaged in a verbal fight with inmates and stated to the Plaintiffs and the other inmates of 12 upper, with a sense of self satisfaction, in sum and substance, that they are mad because they got sick from the foregoing contaminated lunch of same date.

297. That it is Plaintiff JOSEPH JOHNSON's understanding that the only individuals to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas and the two Spanish inmates she picked to assist her with same.

298. That, upon information and belief, approximately four to five days after this March 3, 2015 incident, Defendant Feeney came to AMKC and met with some of the Plaintiffs who gave her a sample of the contaminated food so that the Defendants could test same and during her visit with Plaintiff JOSEPH JOHNSON, she told Plaintiff, in sum and substance, that Rikers does not have anything like that substance that was in the food.

299. That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

300. That it is Plaintiff JOSEPH JOHNSON's understanding that Defendant Feeney received a sample of the foregoing contaminated food and that she observed same to contain blue-green pellets and that same sample would be tested by the Defendants and that other Plaintiffs gave a sample of the remaining contaminated food/lunch that was served to Plaintiffs to be tested by an independent outside laboratory.

301. That it is Plaintiff JOSEPH JOHNSON's understanding that this foregoing sample of the remaining contaminated food was, in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra.*

302. That it is Plaintiff JOSEPH JOHNSON's understanding that, to date, the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or

that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

303. That to date, Plaintiff JOSEPH JOHNSON requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

304. That as Plaintiff JOSEPH JOHNSON was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

305. That as a direct and proximate result of the foregoing, Plaintiff JOSEPH JOHNSON sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, nosebleeds, vomiting, headaches, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

306. That as a direct and proximate result of the foregoing, Plaintiff JOSEPH JOHNSON claims damages herein.

PLAINTIFF CLARENCE WOODWARD, JR.:

307. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff CLARENCE WOODWARD, JR. was incarcerated with/in the New York City

Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

308. That on March 3, 2015, Plaintiff CLARENCE WOODWARD, JR., being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

309. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff CLARENCE WOODWARD, JR., by the Defendants in their respective cells and, as such, Plaintiff CLARENCE WOODWARD, JR. was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff CLARENCE WOODWARD, JR. on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

310. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff CLARENCE WOODWARD, JR., to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff CLARENCE WOODWARD, JR. in said Plaintiff's respective cell.

311. That on March 3, 2015, Plaintiff CLARENCE WOODWARD, JR. received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served on a cart by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, vegetables and/or juice and consumed/ate approximately most of same.

312. That on March 3, 2015 and continuing, Plaintiff CLARENCE WOODWARD, JR. consumed/ate approximately most of the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff CLARENCE WOODWARD, JR., to wit: meatloaf, bread, cabbage, vegetables and/or juice and,

after eating/consuming same, became seriously ill including, but not limited to: stomach pain, stomach ache, headaches, vomiting and diarrhea.

313.    That on March 3, 2015, while Plaintiff CLARENCE WOODWARD, JR. was eating/consuming the foregoing lunch/meal and became ill, he heard other inmates including some of the other Plaintiffs herein, complaining about said lunch/food stating that something was in the food and heard some of the Plaintiffs being sick and/or complaining about being sick after they too consumed the lunch/food served by Defendants on same March 3, 2015.

314.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff CLARENCE WOODWARD, JR. consuming the foregoing lunch/meal that was contaminated, Plaintiff CLARENCE WOODWARD, JR. became seriously ill and sick and suffered and continued to suffer for days thereafter from ailments/medical conditions including, but not limited to: stomach pain, stomach ache, headaches, vomiting and diarrhea.

315.    That on March 3, 2015 and at all relevant times herein mentioned, Defendant Campbell was the "floor officer" for Plaintiffs' housing area/unit in AMKC.

316.    That it is Plaintiff CLARENCE WOODWARD's understanding that other inmates including some of the other Plaintiffs named herein, showed Defendant Campbell the foregoing contaminated lunch/food from their respective trays.

317.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff CLARENCE WOODWARD, JR. consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff CLARENCE WOODWARD, JR., to wit: meatloaf, bread, cabbage, vegetables and/or juice that was provided and served to Plaintiff CLARENCE WOODWARD, JR. in said Plaintiff's respective cell,

Plaintiff CLARENCE WOODWARD, JR. sustained and suffered serious personal and physical injuries including, but not limited to: stomach pain, stomach ache, headaches, vomiting, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

318.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff CLARENCE WOODWARD, JR, after consuming/eating the contaminated lunch/food served to him by Defendants and after becoming seriously ill including, but not limited to: stomach pain, stomach ache, headaches, vomiting and diarrhea, notified a Correction officer believed to be floor officer Defendant Campbell of same and requested to immediately go to the medical clinic to be tested and treated for same.

319.    That eventually, hours after Plaintiff CLARENCE WOODWARD, JR. consumed/ate the contaminated lunch/food served to him by Defendants, after becoming seriously ill including, but not limited to: stomach pain, stomach ache, headaches, vomiting and diarrhea, after notifying Defendant Campbell of same and requesting to immediately go to the medical clinic to be tested and treated for same, Plaintiff CLARENCE WOODWARD was eventually brought to the AMKC Medical Clinic/Facility where, despite knowing of the consumption of the contaminated food and subsequent illnesses he suffered including, but not limited to: stomach pain, stomach ache, headaches, vomiting and diarrhea, the doctor and nurses at AMKC Medical Clinic merely gave him what he understood to be milk of magnesia and sent him back to his cell.  That despite requests, the doctor and nurses at the AMKC Medical Clinic did not/refused/failed test his blood or urine to determine the identity of the contaminant that Plaintiff consumed in order to then render and provide the timely, proper and/or adequate medical care and treatment for same.

320.   That on March 3, 2015, and continuing, and at all relevant times herein mentioned, Plaintiff CLARENCE WOODWARD, JR. made repeated requests for medical care and treatment including but not limited to: being placed on sick call, medical testing to determine what was the contaminant n the foregoing lunch/food so as to determine the proper medical care to then be provided, testing of Plaintiff's blood and/or urine to identify what the contaminant was, and/or to be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiffs' requests and despite knowing that Plaintiff CLARENCE WOODWARD, JR. suffered from stomach pain, stomach ache, headaches, vomiting and diarrhea, and continued to suffer from same, the Defendants denied/refused same requests.

321.   That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff CLARENCE WOODWARD, JR. was forced to only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

322.   That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff CLARENCE WOODWARD, JR. knew and/or learned that the kitchen pantry officer for Plaintiff's housing area in AMKC was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates.

323.    That on March 3, 2015, Plaintiff CLARENCE WOODWARD, JR. knew and/or learned that it was Defendant Thomas who wheeled in the cart of food carrying the trays of the foregoing contaminated food/lunch that was distributed and served to the Plaintiffs herein to consume and eat on same date of March 3, 2015.

324.    That prior to March 3, 2015, Plaintiff CLARENCE WOODWARD, JR. knew and/or learned from other inmates in his housing area/unit that Defendant Thomas does not like their housing area/unit and is always verbally fighting with the inmates.

325.    That it is Plaintiff CLARENCE WOODWARD's understanding that the only individual to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas.

326.    That it is Plaintiff CLARENCE WOODWARD, JR.'s understanding that, subsequent to this March 3, 2015 incident, Defendant Feeney came to AMKC and meet with some of the Plaintiffs herein to interview them and that some of the Plaintiffs gave Defendant Feeney samples of the contaminated food/lunch so that the Defendants could test same.

327.    That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

328.    That it is Plaintiff CLARENCE WOODWARD JR.'s understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

329.     That to date, it is Plaintiff CLARENCE WOODWARD, JR.'s understanding that the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

330.     That to date, Plaintiff CLARENCE WOODWARD, JR. requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

331.     That as Plaintiff CLARENCE WOODWARD, JR. was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

332.     That as a direct and proximate result of the foregoing, Plaintiff CLARENCE WOODWARD, JR. sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, stomach pain, stomach ache, headaches, vomiting, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

333.     That as a direct and proximate result of the foregoing, Plaintiff CLARENCE WOODWARD, JR. claims damages herein.

PLAINTIFF RAMEL ROBINSON:

334.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff RAMEL ROBINSON was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

335.    That on March 3, 2015, Plaintiff RAMEL ROBINSON, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

336.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff RAMEL ROBINSON by the Defendants in their respective cells and, as such, Plaintiff RAMEL ROBINSON was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff RAMEL ROBINSON on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

337.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff RAMEL ROBINSON to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff RAMEL ROBINSON in said Plaintiff's respective cell.

338.    That on March 3, 2015, Plaintiff RAMEL ROBINSON received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served on a cart by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, vegetables and/or juice and consumed/ate approximately all of same.

339.    That on March 3, 2015 and continuing, Plaintiff RAMEL ROBINSON consumed/ate approximately all of the foregoing lunch meal that was ordered, cooked, prepared,

distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff RAMEL ROBINSON to wit: meatloaf, bread, cabbage, vegetables and/or juice and, approximately thirty minutes after eating/consuming same, became seriously ill including, but not limited to: stomach ache, stomach pain, nausea, vomiting, and diarrhea.

340.    That on March 3, 2015, while Plaintiff RAMEL ROBINSON was eating/consuming the foregoing lunch/meal and became ill, he heard other inmates including some of the other Plaintiffs herein, coughing and vomiting, being sick and complaining about the contaminated food and about being sick after they too consumed the lunch/food served by Defendants on same March 3, 2015.

341.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff RAMEL ROBINSON consuming the foregoing lunch/meal that was contaminated, Plaintiff RAMEL ROBINSON became seriously ill and sick and suffered and continued to suffer for days thereafter from ailments/medical conditions including, but not limited to: stomach ache, stomach pain, nausea, vomiting, and diarrhea.

342.    That on March 3, 2015 and at all relevant times herein mentioned, Defendant Campbell was the "floor officer" for Plaintiffs' housing area/unit in AMKC.

343.    That it is Plaintiff RAMEL ROBINSON's understanding that other inmates including some of the other Plaintiffs named herein, showed Defendant Campbell the foregoing contaminated lunch/food from their respective trays.

344.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff RAMEL ROBISNON consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff RAMEL ROBINSON, to wit: meatloaf, bread,

cabbage, vegetables and/or juice that was provided and served to Plaintiff RAMEL ROBINSON in said Plaintiff's respective cell, Plaintiff RAMEL ROBINSON sustained and suffered serious personal and physical injuries including, but not limited to: stomach ache, stomach pain, nausea, vomiting, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

345.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff RAMEL ROBINSON, after consuming/eating the contaminated lunch/food served to him by Defendants and after becoming seriously ill including, but not limited to: stomach ache, stomach pain, nausea, vomiting, and diarrhea notified a Correction officer believed to be floor officer Defendant Campbell of same and requested to immediately go to the medical clinic to be tested and treated for same but Plaintiff RAMEL ROBINSON was denied medical care, treatment and access to the medical clinic until approximately two to three days after he had consumed the contaminated food on March 3, 2015 and became seriously ill where they merely did a "checkup" but, despite his requests, the doctor and nurses at the AMKC Medical Clinic did not/refused/failed test his blood or urine to determine the identity of the contaminant that Plaintiff consumed in order to then render and provide the timely, proper and/or adequate medical care and treatment for same.

346.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, Plaintiff RAMEL ROBINSON made repeated requests for medical care and treatment including but not limited to: being placed on sick call, medical testing to determine what was the contaminant n the foregoing lunch/food so as to determine the proper medical care to then be provided, testing of Plaintiff's blood and/or urine to identify what the contaminant was, and/or to be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and

necessary medical care/treatment in order to treat same but, despite Plaintiffs' requests and despite knowing that Plaintiff RAMEL ROBINSON suffered from stomach ache, stomach pain, nausea, vomiting, and diarrhea, the Defendants denied/refused same requests.

347.    That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff RAMEL ROBINSON refused any food for the following several days thereafter and then was forced to only eat sealed food and/or food from commissary and requested to be served only sealed food by Defendants as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

348.    That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff RAMEL ROBINSON knew that the kitchen pantry officer for Plaintiff's housing area in AMKC was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates.

349.    That on March 3, 2015, Plaintiff RAMEL ROBINSON knew that it was Defendant Thomas who wheeled in the cart of food carrying the trays of the foregoing contaminated food/lunch that was distributed and served to the Plaintiffs herein to consume and eat on same date of March 3, 2015.

350.    That prior to March 3, 2015, Plaintiff RAMEL ROBINSON knew that Defendant Thomas does not like their housing area/unit and is always verbally fighting with the inmates including fighting with inmates the morning of March 3, 2015 before she served the foregoing

contaminated lunch and at dinner subsequent thereto during which she fought with inmates telling them, in sum and substance, that they are mad because of the poisoned lunch.

351.    That it is Plaintiff RAMEL ROBINSON's understanding that the only individual to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas and the inmates that she had assisting her with same on March 3, 2015 who were not form Plaintiffs' housing area/unit.

352.    That it is Plaintiff RAMEL ROBINSON'S understanding that, subsequent to this March 3, 2015 incident, Defendant Feeney came to AMKC and meet with some of the Plaintiffs herein to interview them and that some of the Plaintiffs gave Defendant Feeney samples of the contaminated food/lunch so that the Defendants could test same.

353.    That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

354.    That it is Plaintiff RAMEL ROBINSON's understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

355.    That it is Plaintiff RAMEL ROBINSON.'s understanding that, to date, the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

356. That to date, Plaintiff RAMEL ROBINSON requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

357. That as Plaintiff RAMEL ROBINSON was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

358. That as a direct and proximate result of the foregoing, Plaintiff RAMEL ROBINSON sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, stomach ache, stomach pain, nausea, vomiting, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

359. That as a direct and proximate result of the foregoing, Plaintiff RAMEL ROBINSON claims damages herein.

PLAINTIFF ELLIS WILSON:

360. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff ELLIS WILSON was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

361. That on March 3, 2015, Plaintiff ELLIS WILSON, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

362. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff ELLIS WILSON, by the Defendants in their respective cells and, as such, Plaintiff ELLIS WILSON was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff ELLIS WILSON on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

363. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff ELLIS WILSON, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff ELLIS WILSON in said Plaintiff's respective cell.

364. That on March 3, 2015, Plaintiff ELLIS WILSON received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, vegetables and/or juice and consumed/ate same.

365. That on March 3, 2015 and continuing, after Plaintiff ELLIS WILSON consumed/ate the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff ELLIS WILSON, to wit: meatloaf, bread, cabbage, vegetables and/or juice, after approximately twenty to thirty minutes after consuming/eating same, Plaintiff ELLIS WILSON became ill/sick including but not limited to: sweating, feeling "woozy", feeling hot "pins and needles" sensations, vomiting, headaches,

chest pain, weakness and diarrhea, and, when he looked at the remaining food in the tray and broke open the rest of the meatloaf, he saw green/blue/greenish-blue substance buried in same meatloaf. That Plaintiff ELLIS WILSON also heard, approximately fifteen to twenty minutes after the foregoing lunch meal was served to Plaintiffs, other inmates including some of the Plaintiffs herein, start to become ill and to complain about the contaminated food.

366. That on March 3, 2015, Plaintiff ELLIS WILSON, as well as other Plaintiffs herein, notified Defendant Campbell of the foregoing lunch/food/meal consisting of meatloaf, vegetables, cabbage and/or juice, showed him same, notified him that Plaintiff became ill and needed to go to "medical" and, when Defendant Campbell viewed the contaminated food that Plaintiff ELLIS WILSON showed to him, Defendant Campbell stated to Plaintiff ELLIS WILSON and to other Plaintiffs herein that same food was contaminated and did not "look right".

367. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff ELLIS WILSON consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff ELLIS WILSON, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff ELLIS WILSON in said Plaintiff's respective cell, Plaintiff ELLIS WILSON sustained and suffered serious personal and physical injuries including, but not limited to: sweating, feeling "woozy", feeling hot "pins and needles" sensations, vomiting, headaches, chest pain, weakness, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

368. That on March 3, 2015, and continuing and at all relevant times herein mentioned, Plaintiff ELLIS WILSON, also told Defendant Johnson that the food was contaminated, that he

became ill form same and needed to go to "medical" and also showed the foregoing lunch meal/food to Defendant Johnson who also agreed, after viewing same, that something was wrong in/with the food and that the food did not "look right".

369.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff ELLIS WILSON, after eating/consuming the foregoing contaminated lunch meal/food and after becoming seriously ill from same, including but not limited to sweating, feeling "woozy", feeling hot "pins and needles" sensations, vomiting, headaches, chest pain, weakness and diarrhea, repeatedly requested of Defendants Campbell and Johnson to go to "medical" so that he could be examined, tested, and treated for whatever this contaminant in the foregoing lunch meal/food was and in order to determine what the contaminant was so as to receive the proper, timely and required medical care/treatment for same.

370.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, after Plaintiff ELLIS WILSON's repeated demand to go to "medical", Plaintiff ELLIS WILSON was eventually brought to Defendant, the AMKC Medical Clinic/Facility where, while at sick call, Plaintiff vomited as others of the Plaintiffs also vomited and fainted/passed out/lost consciousness.

371.    That on March 3, 2015, Plaintiff ELLIS WILSON, while at Defendant AMKC Medical Clinic/Facility, showed the medical staff, medical personnel, medical employees, doctors and nurses the foregoing contaminated food and, in response to same, one of Defendants' female doctor/nurse, whose name is unknown to Plaintiff but known to the Defendants, stated to Plaintiff ELLIS WILSON that what was in the food looked like rat poison.

372.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, while Plaintiff ELLIS WILSON was at/in Defendant AMKC Medical Clinic, Plaintiff ELLIS WILSON repeatedly requested that the doctors and nurses there test his blood and/or urine to

determine the identity of the contaminant that was in the food so as to then determine and render the timely, proper and/or adequate medical care and treatment for same but, despite said repeated requests for such testing, the Defendants refused/denied/failed to do same.

373.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff ELLIS WILSON repeatedly requested of the housing unit correction officers, of the doctors and nurses of the AMKC Medical Clinic/Facility that he not be sent back to his cell, that he be treated at the AMKC Medical Clinic/Facility, that his urine and blood be tested and/or that he be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same.

374.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, despite Plaintiff ELLIS WILSON's foregoing repeated requests not be sent back to his cell, that he be treated at the AMKC Medical Clinic/Facility, that his urine and blood be tested and/or that he be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same, the Defendants including the housing unit's corrections officers, the doctors and the nurses at the AMKC Medical Clinic/Facility denied each and every one of Plaintiff's foregoing requests for medical care/treatment and, in particular, for blood and/or urine testing that, in fear of what was in his system from the contaminated food, and, in an effort to be sent to have his blood tested, Plaintiff ELLIS WILSON cut himself, requiring that he be sent to Defendant West Medical Facility/Clinic where he received stitches and where they drew his blood for testing.

375.     That to date, Plaintiff ELLIS WILSON has yet to receive the foregoing blood test results from Defendants and remains untreated for the contaminant that he consumed from the March 3, 2015 lunch served to him by Defendants.

376.     That as Plaintiff ELLIS WILSON was continuing to feel sick and ill, including, but not limited to suffering from sweating, feeling "woozy", feeling hot "pins and needles" sensations, vomiting, headaches, chest pain, weakness and diarrhea, for several days after the March 3, 2015 consumption of the rat poison, and as it was still not yet determined, discovered or even tested by Defendants as to the identity of the contaminant that was causing him to be sick and ill, Plaintiff ELLIS WILSON, from March 3, 2015 and continuing for days thereafter, repeatedly demanded to be placed on/requested/logged in for "sick call" so that he could be medically treated but the Defendants repeatedly denied same despite Plaintiffs' serious medical conditions/ailments of which the Defendants were aware.

377.     That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff ELLIS WILSON was forced to only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

378.     That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff ELLIS WILSON knew that the kitchen pantry officer for Plaintiff's housing area in AMKC, to wit: 12 upper, was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area of 12 upper, who normally would be Plaintiff ELLIS WILSON, was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the

Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates from 12 upper. Rather, on March 3, 2015, for the foregoing lunch meal/food that was served to Plaintiffs on same date, Defendant Thomas had two other inmates from another housing area/unit of AMKC to assist her with the preparation, plating and distribution of the food/meals/lunch on March 3, 2015 that was served, handed out, cooked, prepared, plated and handed out to Plaintiffs to eat on same March 3, 2015.

379.    That on March 3, 2015, prior to the Plaintiffs being served the foregoing contaminated food/lunch/meal on same date, Defendant Thomas engaged in a verbal fight with other inmates from Plaintiffs' housing area, none of those involved in same were any of the Plaintiffs herein, and, right as dinner was being served by Defendant Thomas on same date of March 3, 2015, Defendant Thomas stated to the Plaintiffs and the other inmates of 12 upper, with a sense of self satisfaction and laughing, in sum and substance: "Ha Ha—Y'all mad" from getting sick from the foregoing contaminated lunch of same date.

380.    That it is Plaintiff ELLIS WILSON's understanding that the only individuals to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas and the two other inmates form the other housing unit/area that she picked to assist her with same.

381.    That on March 3, 2015, Plaintiff ELLIS WILSON knew that Defendant Thomas did not like Plaintiff's housing area/unit and that she always had verbal fights with inmates from same housing area/unit.

382.    That it is Plaintiff ELLIS WILSON's understanding that prior to and or at the time of this March 3, 2015 incident, Defendant Thomas was under investigation because she possessed pictures taken of inmates inside her pantry/kitchen pantry/her office and/or station in the pantry/kitchen pantry.

383.   That, upon information and belief, days after this March 3, 2015 incident, Plaintiff saw a red - haired Caucasian female, believed to be Defendant Feeney, came to AMKC and met with some of the Plaintiffs who gave her a sample of the contaminated food so that the Defendants could test same.

384.   That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

385.   That it is Plaintiff ELLIS WILSON's understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

386.   That to date, it is Plaintiff ELLIS WILSON's understanding that the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

387.   That to date, Plaintiff ELLIS WILSON requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

388.   That as Plaintiff ELLIS WILSON was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing,

the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

389. That as a direct and proximate result of the foregoing, Plaintiff ELLIS WILSON sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, sweating, feeling "woozy", feeling hot "pins and needles" sensations, vomiting, headaches, chest pain, weakness, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

390. That as a direct and proximate result of the foregoing, Plaintiff ELLIS WILSON claims damages herein.

PLAINTIFF BERNABE LOPEZ:

391. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff BERNABE LOPEZ was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

392. That on March 3, 2015, Plaintiff BERNABE LOPEZ, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

393. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff BRENABE LOPEZ, by the Defendants in their respective cells and, as such, Plaintiff BERNABE LOPEZ was not allowed to exit his cell for said meals including for the lunch served

by Defendants to Plaintiffs including Plaintiff BERNABE LOPEZ on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

394.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff BERNABE LOPEZ, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff BERNABE LOPEZ in said Plaintiff's respective cell.

395.    That on March 3, 2015, Plaintiff BERNABE LOPEZ received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served on a cart by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, vegetables, corn and/or juice and consumed/ate a portion of same.

396.    That on March 3, 2015 and continuing, Plaintiff BERNABE LOPEZ consumed/ate a portion of the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff BERNABE LOPEZ, to wit: meatloaf, bread, cabbage, vegetables, corn and/or juice and, after eating/consuming same, became seriously ill including, but not limited to: vomiting and diarrhea.

397.    That on March 3, 2015, and continuing, and at all relevant times herein mentioned, after Plaintiff BERNABE LOPEZ ate/consumed the foregoing lunch and became ill, he looked at the food in his tray and saw green "pebbles".

398.    That as a direct and proximate result of Plaintiff BERNABE LOPEZ consuming the foregoing lunch/meal that contained the green "pebbles", Plaintiff BERNABE LOPEZ became seriously ill and sick and suffered ailments/medical conditions including, but not limited to: vomiting and diarrhea.

399.    That on March 3, 2015 and at all relevant times herein mentioned, Defendant Campbell was the "floor officer" for Plaintiffs' housing area/unit in AMKC.

400.    That it is Plaintiff BERNABE LOPEZ's understanding that other inmates including some of the other Plaintiffs named herein, showed Defendant Campbell the foregoing contaminated lunch/food from their respective trays.

401.    That on March 3, 2015, Plaintiff BERNABE LOPEZ, showed one of the housing area/unit's correction officers, name unknown to Plaintiff but known to the Defendants, his tray of contaminated food and the correction officer took the Plaintiff's tray of contaminated food and refused to return it to Plaintiff BERNABE LOPEZ so that Plaintiff could save the contaminated food in order to have same tested so as to determine what the contaminant was and so that, once the identity of the contaminant was determined, he could receive the timely, proper and/or adequate medical care to treat same.

402.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff BERNABE LOPEZ consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff BERNABE LOPEZ, to wit: meatloaf, bread, cabbage, vegetables, corn and/or juice that was provided and served to Plaintiff BERNABE LOPEZ in said Plaintiff's respective cell, Plaintiff BERNABE LOPEZ sustained and suffered serious personal and physical injuries including, but not limited to: vomiting, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

403.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff BERNABE LOPEZ, after consuming/eating the contaminated lunch/food served to him by Defendants and after becoming seriously ill including, but not limited to: vomiting and

diarrhea, notified the housing unit/area's correction officer, believed to be Defendant Campbell of same and repeatedly requested to immediately go to the medical clinic to be tested and treated for same but was not brought to the medical clinic until approximately four hours after he consumed the contaminated food and became ill.

404.    That on March 3, 2015, while Plaintiff BERNABE LOPEZ, was waiting for approximately four hours to be brought to the medical clinic, Plaintiff continued to vomit in his cell.

405.    That on March 3, 2015, after waiting approximately six to seven hours after Plaintiff BERNABE LOPEZ consumed/ate the contaminated lunch/food served to him by Defendants, after becoming seriously ill including, but not limited to: vomiting and diarrhea, after notifying the housing unit's correction officer believed to be Defendant Campbell of same and requesting to immediately go to the medical clinic to be tested and treated for same, and after waiting for approximately four hours in his cell where he continued to vomit, Plaintiff BERNABE LOPEZ was eventually brought to the AMKC Medical Clinic/Facility where, despite knowing of the consumption of the contaminated food and subsequent illnesses he suffered including, but not limited to: vomiting and diarrhea, the doctor and nurses at AMKC Medical Clinic merely took his blood pressure and sent him back to his cell.

406.    That on March 3, 2015, when Plaintiff BRENABE LOPEZ was finally brought to the medical clinic, Plaintiff BERNABE LOPEZ had brought his contaminated food with him and showed same to the doctor (not Dr. Park as Dr. Park refused to examine and treat him) and nurses who told Plaintiff BERNABE LOPEZ, in sum and substance, that the foreign substance in the food appeared to them to be "Industrial rat poison". When they sent Plaintiff back to his cell after taking his blood pressure, it was then when he returned to his cell that the aforementioned correction officer asked to see his tray of contaminated food, took his tray of contaminated food

and refused to return same to Plaintiff BERNABE LOPEZ. When Plaintiff BERNABE LOPEZ returned to his cell after being inadequately and improperly treated at the medical clinic, he continued to vomit in his cell.

407. That on March 3, 2015, when Plaintiff BERNABE LOPEZ was in the medical clinic, he saw another inmate there with said inmate's lunch juice where the doctor and/or nurses told that inmate that the "Industrial rat poison" was also in said inmate's juice.

408. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as Plaintiff BERNABE LOPEZ continued to be sick and suffer from vomiting and diarrhea for days after this March 3, 2015 incident, he repeatedly requested for days to be placed on sick call, to go to "medical", to be brought to an outside hospital for testing and treatment and/or to have his blood and/or urine tested—all of which were denied/refused by the Defendants and their agents, employees, medical staff, doctors, nurses and correction officers.

409. That on March 3, 2015, and continuing, and at all relevant times herein mentioned, Plaintiff BERNABE LOPEZ made repeated requests for medical care and treatment including but not limited to: being placed on sick call, medical testing to determine what was the contaminant n the foregoing lunch/food so as to determine the proper medical care to then be provided, testing of Plaintiff's blood and/or urine to identify what the contaminant was, and/or to be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiffs' requests and despite knowing that Plaintiff BERNABE LOPEZ suffered from vomiting and diarrhea, the Defendants denied/refused same.

410. That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and

becoming seriously ill as a direct and proximate result therefrom, Plaintiff BERNABE LOPEZ was forced to refuse meals and/or only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

411.    That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff BERNABE LOPEZ knew that the kitchen pantry officer for Plaintiff's housing area in AMKC was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates.

412.    That on March 3, 2015, Plaintiff BERNABE LOPEZ knew and/or learned that it was Defendant Thomas who wheeled in the cart of food carrying the trays of the foregoing contaminated food/lunch that was distributed and served to the Plaintiffs herein to consume and eat on same date of March 3, 2015.

413.    That prior to March 3, 2015, Plaintiff BERNABE LOPEZ knew that Defendant Thomas does not like their housing area/unit and is always verbally fighting with the inmates. That on March 4, 2015, the following day after Plaintiff BERNABE LOPEZ and the other Plaintiffs herein consumed the contaminated food and became ill, Plaintiff BERNABE LOPEZ and others complained to Defendant Thomas about said contaminated food and, in response to same, Defendant Thomas stuck up/gave then her middle finger, signifying to them the "f... you" hand gesture.

414.    That it is Plaintiff BERNABE LOPEZ's understanding that the only individual to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas.

415.    That it is Plaintiff BERNABE LOPEZ's understanding that subsequent to this March 3, 2015 incident, Defendant Feeney came to AMKC and meet with some of the Plaintiffs herein to interview them and learned that some of the Plaintiffs gave Defendant Feeney samples of the contaminated food/lunch so that the Defendants could test same.

416.    That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found as they did to Plaintiff BERNABE LOPEZ on March 3, 2015.

417.    That it is Plaintiff BERNABE LOPEZ's understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

418.    That to date, it is Plaintiff BERNABE LOPEZ's understanding that the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

419.    That to date, Plaintiff BERNABE LOPEZ requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was

served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

420.    That as Plaintiff BERNABE LOPEZ was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

421.    That as a direct and proximate result of the foregoing, Plaintiff BERNABE LOPEZ sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, vomiting, diarrhea, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

422.    That as a direct and proximate result of the foregoing, Plaintiff BERNABE LOPEZ claims damages herein.

PLAINITFF RASHAUN ROWE:

423.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff RASHAUN ROWE was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

424.    That on March 3, 2015, Plaintiff RASHAUN ROWE, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

425. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff RASHAUN ROWE by the Defendants in their respective cells and, as such, Plaintiff RASHAUN ROWE was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff RASHAUN ROWE on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

426. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff RASHAUN ROWE to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff RASHAUN ROWE in said Plaintiff's respective cell.

427. That on March 3, 2015, Plaintiff RASHAUN ROWE received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served on a cart by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, vegetables and/or juice and consumed/ate almost all of same.

428. That on March 3, 2015 and continuing, Plaintiff RASHAUN ROWE consumed/ate almost all of the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff RASHAUN ROWE to wit: meatloaf, bread, cabbage, corn, vegetables and/or juice and, approximately fifteen to twenty minutes after eating/consuming same, became seriously ill including, but not limited to: body feeling hot, throat dry and scratchy, difficulty swallowing, headaches, spitting up blood, diarrhea, sweating, and foaming of the mouth and, when he looked at the remanats of the food left in his tray, he saw "blue stuff" in the food, "bluish-green spots" in the food and in the corner slots of his tray.

429.   That on March 3, 2015, while Plaintiff RASHAUN ROWE was eating/consuming the foregoing lunch/meal and became ill, he heard other inmates including some of the other Plaintiffs herein, getting sick from the food and complaining about the contaminated food after they too consumed the lunch/food served by Defendants on same March 3, 2015.

430.   That on March 3, 2015, and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff RASHAUN ROWE consuming the foregoing lunch/meal that was contaminated, Plaintiff RASHAUN ROWE became seriously ill and sick and suffered and continued to suffer for days thereafter from ailments/medical conditions including, but not limited to: body feeling hot, throat dry and scratchy, difficulty swallowing, headaches, spitting up blood, diarrhea, sweating, and foaming of the mouth and loss of weight from refusing meals and only eating commissary food.

431.   That on March 3, 2015 and at all relevant times herein mentioned, Defendant Campbell was the "floor officer" for Plaintiffs' housing area/unit and Defendnt Wilson was the officer in the "bubble" of Plaintiffs' housing area/unit in AMKC.

432.   That on March 3, 2015, once Plaintiff RASHAUN ROWE became ill after consuming the contaminated lunch/food, he immediately called for Defendant Campbell and Defendant Wilson repeatedly requested to go to "medical" but his requests for medical care were repeatedly denied/refused until approximately five hours after he consumed said contaminated food and became ill from same.

433.   That it is Plaintiff RASHAUN ROWE's understanding that other inmates including some of the other Plaintiffs named herein, showed Defendant Campbell the foregoing contaminated lunch/food from their respective trays.

434.   That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff RASHAUN ROWE consuming/eating the

foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff RASHAUN ROWE, to wit: meatloaf, bread, cabbage, corn, vegetables and/or juice that was provided and served to Plaintiff RASHAUN ROWE in said Plaintiff's respective cell, Plaintiff RASHAUN ROWE sustained and suffered serious personal and physical injuries including, but not limited to: body feeling hot, throat dry and scratchy, difficulty swallowing, headaches, spitting up blood, diarrhea, sweating, foaming of the mouth, loss of weight, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

435.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, when Plaintiff RASHAUN ROWE was finally brought to the medical clinic approximately five hours after consuming the contaminated food and becoming ill from same, Plaintiff RASHAUN ROWE brought the remnants of food from his tray with him and showed his food to a nurse, name unknown to Plaintiff but known to Defendants who, in response to viewing Plaintiff's food, told Plaintiff RASHAUN ROWE, in sum and substance, that she believed it to be rat poison.

436.    That on March 3, 2015, despite knowing that Plaintiff RASHAUN ROWE consumed the contaminated food and was suffering from body feeling hot, throat dry and scratchy, difficulty swallowing, headaches, spitting up blood, diarrhea, sweating, foaming of the mouth as a direct result from same, the doctors and nurses merely took his blood pressure, Defendant Director Park refused Plaintiff's requests to take and test his blood and sent him back to his cell.

437.    That on March 3, 2015 and continuing, as Plaintiff RASHAUN ROWE was still suffering from body feeling hot, throat dry and scratchy, difficulty swallowing, headaches,

spitting up blood, diarrhea, sweating, foaming of the mouth after having consumed the contaminated food, Plaintiff RASHAUN ROWE repeatedly requested to be placed on sick call for days thereafter, but was repeatedly denied same, was threatened to be "sprayed" if he continued to request/demand same and was denied the timely, proper and/or adequate medical care, including, but not limited to testing his blood, as Plaintiff requested, so that the identity of the contaminant could be determined so that Plaintiff could then receive the timely, proper and adequate medical care to treat same.

438.    That on March 3, 2015, and continuing for days thereafter, and at all relevant times herein mentioned, Plaintiff RASHAUN ROWE made repeated requests for medical care and treatment including but not limited to: being placed on sick call, medical testing to determine what was the contaminant n the foregoing lunch/food so as to determine the proper medical care to then be provided, testing of Plaintiff's blood and/or urine to identify what the contaminant was, and/or to be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiffs' requests and despite knowing that Plaintiff RASHAUN ROWE suffered from body feeling hot, throat dry and scratchy, difficulty swallowing, headaches, spitting up blood, diarrhea, sweating, foaming of the mouth, the Defendants denied/refused same requests.

439.    That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff RASHAUN ROWE refused any food for the following several days thereafter and then was forced to only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served,

handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

440.    That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff RASHAUN ROWE knew that the kitchen pantry officer for Plaintiff's housing area in AMKC was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates.

441.    That on March 3, 2015, Plaintiff RASHAUN ROWE knew that it was Defendant Thomas who wheeled in the cart of food carrying the trays of the foregoing contaminated food/lunch that was distributed and served to the Plaintiffs herein to consume and eat on same date of March 3, 2015 and that she had inmates from other housing unit/area assist her with same.

442.    That prior to March 3, 2015, Plaintiff RASHAUN ROWE knew and/or learned from other inmates that Defendant Thomas does not like their housing area/unit and is always verbally fighting with the inmates including fighting with inmates the morning of March 3, 2015 before she served the foregoing contaminated lunch.

443.    That it is Plaintiff RASHAUN ROWE's understanding that the only individual to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas and the inmates that she had assisting her with same on March 3, 2015 who were not form Plaintiffs' housing area/unit.

444.    That it is Plaintiff RASHAUN ROWE'S understanding that, subsequent to this March 3, 2015 incident, Defendant Feeney came to AMKC and meet with some of the Plaintiffs

herein to interview them and that some of the Plaintiffs gave Defendant Feeney samples of the contaminated food/lunch so that the Defendants could test same.

445.    That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

446.    That it is Plaintiff RASHAUN ROWE's understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison.  See Exhibit "A", *supra.*

447.    That it is Plaintiff RASHAUN ROWE's understanding that, to date, the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

448.    That to date, Plaintiff RASHAUN ROWE requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

449.    That as Plaintiff RASHAUN ROWE was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been

caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

450.     That as a direct and proximate result of the foregoing, Plaintiff RASHAUN ROWE sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, body feeling hot, throat dry and scratchy, difficulty swallowing, headaches, spitting up blood, diarrhea, sweating, foaming of the mouth, loss of weight, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

451.     That as a direct and proximate result of the foregoing, Plaintiff RASHAUN ROWE claims damages herein.

PLAINITFF JAMEL EDMONDS:

452.     That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff JAMEL EDMONDS was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

453.     That on March 3, 2015, Plaintiff JAMEL EDMONDS, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

454.     That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff JAMEL EDMONDS, by the Defendants in their respective cells and, as such, Plaintiff JAMEL EDMONDS was not allowed to exit his cell for said meals including for the lunch

served by Defendants to Plaintiffs including Plaintiff JAMEL EDMONDS on March 3, 2015, to wit: meatloaf, bread, vegetables, cabbage and/or juice.

455.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff JAMEL EDMONDS, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff JAMEL EDMONDS in said Plaintiff's respective cell.

456.    That on March 3, 2015, Plaintiff JAMEL EDMONDS received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, vegetables and/or juice and consumed/ate a portion of same.

457.    That on March 3, 2015 and continuing, after Plaintiff JAMEL EDMONDS consumed/ate a portion of said lunch/food that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff JAMEL EDMONDS, to wit: meatloaf, bread, cabbage, vegetables and/or juice, Plaintiff JAMEL EDMONDS became ill/sick and, when he looked at the remnants of the foregoing lunch in the tray he was served/provided by Defendants, he saw green-blue "pebbles" in same, and, in particular in the meatloaf and cabbage, and immediately called for Defendant Campbell, the Correction Officer assigned to/on duty for the Plaintiffs' housing area in AMKC when the foregoing lunch was served and the Correction Officer who assisted in serving the Plaintiffs, including Plaintiff JAMEL EDMONDS with the March 3, 2015 lunch trays consisting of the foregoing meatloaf, bread, vegetables, cabbage and/or juice.

458.    That on March 3, 2015, Plaintiff JAMEL EDMONDS, as well as other Plaintiffs herein, showed Defendant Campbell the foregoing lunch/food/meal consisting of meatloaf,

vegetables, cabbage and/or juice and, in response to viewing said food in the light, and after Plaintiff JAMEL EDMONDS became ill including, but not limited to: fainting, passing out, losing consciousness, vomiting, dizziness, vomiting up blood, nausea, breathing heavy, difficulty breathing and diarrhea with blood, Defendant Campbell called for emergency medical.

459.    That on March 3, 2015, when Plaintiff JAMEL EDMONDS ate/consumed a portion of the contaminated lunch and saw the green-blue "pebbles" in same, he heard other inmates including Plaintiffs TROY SIDDONS, REGINALD DUPREE and ANDRE POUNALL complaining about the lunch/food and calling out for Defendant Campbell for assistance/aid.

460.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff JAMEL EDMONDS consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff JAMEL EDMONDS, to wit: meatloaf, bread, cabbage, vegetables and/or juice was provided and served to Plaintiff JAMEL EDMONDS in said Plaintiff's respective cell, Plaintiff JAMEL EDMONDS sustained and suffered serious personal and physical injuries including, but not limited to: fainting, passing out, losing consciousness, vomiting, dizziness, vomiting up blood, nausea, breathing heavy, difficulty breathing, diarrhea with blood, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

461.    That on March 3, 2015, after Plaintiff JAMEL EDMONDS ate/consumed a portion of the contaminated food and became ill including, but not limited to: fainting, passing out, losing consciousness, vomiting, dizziness, vomiting up blood, nausea, breathing heavy, difficulty breathing, and diarrhea with blood, he was transported to the "emergency medical clinic" on a stretcher and, yet, despite knowing of all of the foregoing that Plaintiff JAMEL EDMONDS was suffering from, including vomiting up blood in the clinic, the doctors and

nurses in the clinic, names unknown to Plaintiff but known to Defendants including an African American female with glasses, an accent and low cut hair and a Spanish male, merely checked his pulse and gave him a liquid substance believed to be Maylox.

462. That on March 3, 2015, despite knowing that Plaintiff JAMEL EDMONDS ate/consumed a portion of the contaminated food and became ill therefrom including, but not limited to: fainting, passing out, losing consciousness, vomiting, dizziness, vomiting up blood, nausea, breathing heavy, difficulty breathing, and despite knowing that Plaintiff was transported to the "emergency medical clinic" via stretcher and that he vomited up blood while in the clinic, Defendant Dunbar obstructed, denied, refused, hindered, hampered and/or otherwise impeded and/or sought to hinder/deny/obstruct/prevent/refuse Plaintiff medical care and treatment by placing him and the other inmates at/in the medical clinic on lockdown and by forcing any such medical treatment to be provided to Plaintiff and the other inmates at the clinic only inside of the "pens"/cell.

463. That on March 3, 2015, while Plaintiff JAMEL EDMONDS was in the emergency medical clinic", the aforementioned female African American doctor or nurse with glasses, an accent and low cut hair told Plaintiff JAMEL EDMONDS that the green and blue "pebbles in his food looked like rat poison to her.

464. That on March 3, 2015 and continuing, and at all relevant times herein mentioned, while Plaintiff JAMEL EDMONDS was at/in the "emergency medical clinic", where they only checked his pulse and gave him Maylox and sent back to his cell despite knowing that Plaintiff JAMEL EDMONDS fainted, was transported to the clinic on a stretcher, vomited blood in the clinic and had diarrhea with blood, Plaintiff repeatedly requested of the doctors and nurses at the clinic, including the aforementioned African American femal with an accent and the Spanish male, that he not be sent back to his cell, that he be treated at the AMKC Medical Clinic/Facility,

that his urine and blood be tested and/or that he be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiff's repeated requests and physical condition, the Defendants and their agents/servants/employees/corrections officers/doctors and nurses refused/denied him same.

465.    That as Plaintiff JAMEL EDMONDS was continuing to feel sick and ill, including, but not limited to suffering from vomiting, vomiting up blood and diarrhea with blood for several days after the March 3, 2015 consumption of the rat poison, and as it was still not yet determined, discovered or even tested by Defendants as to the identity of the contaminant that was causing him to be sick and ill, Plaintiff JAMEL EDMONDS, from March 3, 2015 and continuing for days thereafter, repeatedly demanded to be placed on/requested/logged in for "sick call" and to go to the medical clinic for medical treatment but the Defendants repeatedly denied same despite Plaintiffs' serious medical conditions/ailments of which the Defendants were aware.

466.    That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff JAMEL EDMONDS was forced to only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

467.    That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff JAMEL EDMONDS knew that the kitchen pantry officer for Plaintiff's housing area in AMKC, to wit: 12 upper, was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from

Plaintiff's housing area of 12 upper was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates from 12 upper. Rather, on March 3, 2015, for the foregoing lunch meal/food that was served to Plaintiffs on same date, Defendant Thomas had two other inmates from another housing area/unit of AMKC to assist her with the preparation, plating and distribution of the food/meals/lunch on March 3, 2015 that was served, handed out, cooked, prepared, plated and handed out to Plaintiffs to eat on same March 3, 2015.

468.    That on March 3, 2015, prior to the Plaintiffs being served the foregoing contaminated food/lunch/meal on same date, Defendant Thomas engaged in a verbal fight with other inmates from Plaintiffs' housing area, none of those involved in same were any of the Plaintiffs herein and disliked Plaintiffs' housing area/unit.

469.    That on March 3, 2015, Plaintiff JAMEL EDMONDS saw Defendant Thomas push in the cart of lunch trays and saw Defendant Campbell distributing lunch trays to the inmates in the Plaintiffs' housing area/unit.

470.    That it is Plaintiff JAMEL EDMONDS's understanding that the only individuals to have access to the foregoing contaminated lunch/meal for cooking, preparation, plating, serving and distributing was Defendant Thomas, the two other inmates she picked to assist her with same and Defendant Campbell.

471.    That, upon information and belief, approximately four to five days after this March 3, 2015 incident, Defendant Feeney came to AMKC and met with some of the Plaintiffs who gave her a sample of the contaminated food so that the Defendants could test same including, but not limited to samples of the contaminated juice, meatloaf and cabbage and told the Plaintiffs that she would be testing same.

472.    That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

473.    That it is Plaintiff JAMEL EDMONDS's understanding that the foregoing sample of the contaminated food saved by some of the Plaintiffs herein was sent for testing by an outside independent laboratory and that this sample of his contaminated food was, in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra.*

474.    That to date, it is Plaintiff JAMEL EDMONDS's understanding that the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

475.    That to date, Plaintiff JAMEL EDMONDS requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

476.    That as Plaintiff JAMEL EDMONDS was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

477.    That as a direct and proximate result of the foregoing, Plaintiff JAMEL EDMONDS sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, fainting, passing out, losing consciousness, vomiting, dizziness, vomiting up blood, nausea, breathing heavy, difficulty breathing, diarrhea with blood, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

478.    That as a direct and proximate result of the foregoing, Plaintiff JAMEL EDMONDS claims damages herein.

PLAINTIFF ROBERT WOOTEN:

479.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff ROBERT WOOTEN was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

480.    That on March 3, 2015, Plaintiff ROBERT WOOTEN, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

481.    That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff ROBERT WOOTEN, by the Defendants in their respective cells and, as such, Plaintiff ROBERT WOOTEN was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff ROBERT WOOTEN on March 3, 2015, to wit: meatloaf, bread, vegetables, corn, cabbage and/or juice.

482.   That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff ROBERT WOOTEN, to wit: meatloaf, bread, cabbage, corn, vegetables and/or juice was provided and served to Plaintiff ROBERT WOOTEN in said Plaintiff's respective cell.

483.   That on March 3, 2015, Plaintiff ROBERT WOOTEN received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, corn, vegetables and/or juice and consumed/ate a portion of same.

484.   That on March 3, 2015 and continuing, after Plaintiff ROBERT WOOTEN consumed/ate a portion of said lunch/food that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff ROBERT WOOTEN, to wit: meatloaf, bread, cabbage, corn, vegetables and/or juice, Plaintiff ROBERT WOOTEN became ill/sick and, when he looked at the remnants of the foregoing lunch in the tray he was served/provided by Defendants, he saw bluish-green "pebbles" in same.

485.   That on March 3, 2015, when Plaintiff ROBERT WOOTEN ate/consumed a portion of the contaminated lunch and saw the bluish-green "pebbles" in same, he heard other inmates including some of the Plaintiffs herein complaining about the food, complaining to Defendant Thomas about the food, Defendant Thomas arguing with the other inmates who complained to her about the food with screaming of "f... you", vomiting and getting sick after they too ate/consumed same lunch.

486.   That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff ROBERT WOOTEN consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and

served by Defendants to Plaintiff ROBERT WOOTEN, to wit: meatloaf, bread, cabbage, vegetables, corn and/or juice was provided and served to Plaintiff ROBERT WOOTEN in said Plaintiff's respective cell, Plaintiff ROBERT WOOTEN sustained and suffered serious personal and physical injuries including, but not limited to: vomiting, spitting up blood, diarrhea, sweating, stomach cramps, feeling "woozy", headaches, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

487.     That on March 3, 2015, after Plaintiff ROBERT WOOTEN ate/consumed a portion of the contaminated food and became ill including, but not limited to: vomiting, spitting up blood, diarrhea, sweating, stomach cramps, feeling "woozy", headaches, he screamed to the two correction officers that were on duty in the Plaintiffs' housing area/unit, believed to be Defendants Campbell and Wilson that he was sick and needed to go to "medical" and, finally, after waiting approximately six to eight hours after same, Plaintiff was brought to the medical clinic approximately six to eight hours after same where the doctor who treated Plaintiff told Plaintiff ROBERT WOOTEN that the contaminant in the lunch that caused Plaintiff to become ill was rat poison, gave Plaintiff some medication to drink and told Plaintiff, in sum and substance that even though he ate rat poison, he (Plaintiff ROBERT WOOTEN) will not die from it. That after the foregoing, Plaintiff was sent back to his cell.

488.     That on March 3, 2015, while Plaintiff ROBERT WOOTEN was in the medical clinic, Plaintiff repeatedly requested that the doctor and/or nurses test his blood so as to identify officially what the food contaminant was so that they could then provide Plaintiff with the timely, proper and/or adequate medical care and treatment for same but, despite Plaintiff's consumption of the poison, despite his serious physical ailments and despite his repeated

requests for blood testing, Defendants, their agents, servants, employees, doctors and nurses denied Plaintiff ROBERT WOOTEN same.

489.   That on March 3, 2015 when Plaintiff ROBERT WOOTEN drank the liquid medication that the aforementioned clinic doctor gave to him, he vomited again.

490.   That on March 3, 2015 and continuing, and at all relevant times herein mentioned, while Plaintiff ROBERT WOOTEN was at/in the medical clinic, where they gave him liquid medication, told him it was rat poison, knew of his serious medical ailments and denied his requests to test his blood, Plaintiff ROBERT WOOTEN repeatedly requested that he not be sent back to his cell, that he be treated at the AMKC Medical Clinic/Facility, that his urine and blood be tested and/or that he be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiff's repeated requests and physical condition, the Defendants and their agents/servants/employees/corrections officers/doctors and nurses refused/denied him same.

491.   That as Plaintiff ROBERT WOOTEN was continuing to feel sick and ill, including, but not limited to suffering from vomiting, spitting up blood, diarrhea, sweating, stomach cramps, feeling "woozy", headaches for several days after the March 3, 2015 consumption of the rat poison, and as it was still not yet determined, discovered or even tested by Defendants as to the identity of the contaminant that was causing him to be sick and ill, Plaintiff ROBERT WOOTEN, from March 3, 2015 and continuing for days thereafter, repeatedly demanded to be placed on/requested/logged in for "sick call" and to go to the medical clinic for medical treatment but the Defendants repeatedly denied same despite Plaintiffs' serious medical conditions/ailments of which the Defendants were aware.

492. That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff ROBERT WOOTEN was forced to only eat sealed food and/or food from commissary as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

493. That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff ROBERT WOOTEN knew that the kitchen pantry officer for Plaintiff's housing area in AMKC, to wit: 12 upper, was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area of 12 upper was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates from 12 upper. Rather, on March 3, 2015, for the foregoing lunch meal/food that was served to Plaintiffs on same date, Defendant Thomas had two other inmates from another housing area/unit of AMKC to assist her with the preparation, plating and distribution of the food/meals/lunch on March 3, 2015 that was served, handed out, cooked, prepared, plated and handed out to Plaintiffs to eat on same March 3, 2015.

494. That on March 3, 2015, prior to the Plaintiffs being served the foregoing contaminated food/lunch/meal on same date, Defendant Thomas engaged in a verbal fight with other inmates from Plaintiffs' housing area, none of those involved in same were any of the Plaintiffs herein and disliked Plaintiffs' housing area/unit.

495. That on March 3, 2015, Plaintiff ROBERT WOOTEN knew and/or learned that Defendant Thomas pushed in the cart of lunch trays that were distributed to the inmates in the Plaintiffs' housing area/unit and to the Plaintiffs named herein.

496.   That it is Plaintiff ROBERT WOOTEN's understanding that the only individuals to have access to the foregoing contaminated lunch/meal for cooking, preparation, plating, serving and distributing was Defendant Thomas and the two other inmates she picked to assist her with same.

497.   That, several days subsequent to this March 3, 2015 incident, Defendant Feeney came to AMKC and met with some of the Plaintiffs who gave her a sample of the contaminated food so that the Defendants could test same including, but not limited to samples of the contaminated juice, meatloaf and cabbage and told the Plaintiffs, in sum and substance, that the contaminant appeared to be rat poison, that the Plaintiffs' ailments are consistent with consumption of rat poison and that same ailments will not be long lasting.

498.   That from March 3, 2015 and continuing, some of the Plaintiffs saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

499.   That it is Plaintiff ROBERT WOOTEN's understanding that the foregoing sample of the contaminated food saved by some of the Plaintiffs herein was sent for testing by an outside independent laboratory and that this sample of his contaminated food was, in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

500.   That to date, it is Plaintiff ROBERT WOOTEN's understanding that the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

501.    That to date, Plaintiff ROBERT WOOTEN requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

502.    That as Plaintiff ROBERT WOOTEN was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.

503.    That as a direct and proximate result of the foregoing, Plaintiff ROBERT WOOTEN sustained and suffered serious personal, physical and psychological injuries and damages herein including, but not limited to: consumption of rat poison, vomiting, spitting up blood, diarrhea, sweating, stomach cramps, feeling "woozy", headaches, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety, pain and suffering and denial of proper, timely and/or adequate medical care and treatment.

504.    That as a direct and proximate result of the foregoing, Plaintiff ROBERT WOOTEN claims damages herein.

PLAINTIFF TYSEAN SAIGO:

505.    That on March 3, 2015 and continuing, and at all relevant times herein mentioned, Plaintiff TYSEAN SAIGO was incarcerated with/in the New York City Department of Corrections, Rikers Island Correctional Facility and was housed in the Anna M. Kross Center (AMKC).

506. That on March 3, 2015, Plaintiff TYSEAN SAIGO, being housed in AMKC, was placed on lockdown by the Defendants and, as such, was not permitted by Defendants to exit his cell including not being allowed to exit his cell for meals.

507. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the meals for the inmates on March 3, 2015 were given to them, including to Plaintiff TYSEAN SAIGO by the Defendants in their respective cells and, as such, Plaintiff TYSEAN SAIGO was not allowed to exit his cell for said meals including for the lunch served by Defendants to Plaintiffs including Plaintiff TYSEAN SAIGO on March 3, 2015, to wit: meatloaf, bread, vegetables, corn, cabbage and/or juice.

508. That on March 3, 2015, as part of AMKC being placed on lockdown by the Defendants, the foregoing lunch meal ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TYSEAN SAIGO to wit: meatloaf, bread, cabbage, corn, vegetables and/or juice was provided and served to Plaintiff TYSEAN SAIGO in said Plaintiff's respective cell.

509. That on March 3, 2015, Plaintiff TYSEAN SAIGO received the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served on a cart by Defendants to him in his cell, to wit: meatloaf, bread, cabbage, vegetables corn and/or juice and consumed/ate almost all of same.

510. That on March 3, 2015 and continuing, Plaintiff TYSEAN SAIGO consumed/ate almost all of the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TYSEAN SAIGO to wit: meatloaf, bread, cabbage, corn, vegetables and/or juice and, approximately fifteen to twenty minutes after eating/consuming same, became seriously ill including, but not limited to: headaches, nosebleeds, stomach pain, stomach cramps and stomach aches and, when he looked

at the remnants of the food left in his tray, he saw green-blue pellets/pebbles in the meatloaf and vegetables and corn in particular.

511. That on March 3, 2015, while Plaintiff TYSEAN SAIGO was eating/consuming the foregoing lunch/meal and became ill, he heard other inmates including some of the other Plaintiffs herein, getting sick from the food, including hearing other inmates vomiting, and complaining about the contaminated food after they too consumed the lunch/food served by Defendants on same March 3, 2015.

512. That on March 3, 2015, and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff TYSEAN SAIGO consuming the foregoing lunch/meal that was contaminated, Plaintiff TYSEAN SAIGO became seriously ill and sick and suffered and continued to suffer for days thereafter from ailments/medical conditions including, but not limited to: headaches, nosebleeds, stomach pain, stomach cramps and stomach aches.

513. That on March 3, 2015 and at all relevant times herein mentioned, it is Plaintiff TYSEAN SAIGO's understanding that Defendant Campbell was the "floor officer"/officer on post for Plaintiffs' housing area/unit in AMKC.

514. That on March 3, 2015, once Plaintiff TYSEAN SAIGO became ill after consuming the contaminated lunch/food, he immediately called for the officer on post, name unknown to Plaintiff but known to Defendants, who was Caucasian, tall and appeared to be in his late 40's, and told same officer on post that he became sick after eating the lunch, including but not limited to nosebleeds and stomach pain, and that he needed to go to the medical clinic but was denied/refused same until approximately two days after this March 3, 2015 incident when Plaintiff was finally allowed "sick call".

515.   That on or about March 5, 2015, when Plaintiff TYSEAN SAIGO was finally allowed to go to "sick call", and was brought to the medical clinic, Plaintiff complained to the doctor and nurses, names unknown to Plaintiff but known to the Defendants, that he ate the contaminated lunch that was served on March 3, 2015 and that he has been suffering from headaches, nosebleeds, stomach pain, stomach cramps and stomach aches.  During this "sick call" visit on or about March 5, 2015, Plaintiff TYSEAN SAIGO also repeatedly demanded that they test his blood so as to determine the identity of the contaminant contained in the March 3, 2015 lunch that he was served and caused him to become sick so that then Plaintiff could receive the proper, timely and/or adequate medical treatment for same.

516.   That it is Plaintiff TYSEAN SAIGO's understanding that other inmates including some of the other Plaintiffs named herein, showed Defendant Campbell, the "floor officer" for Plaintiffs' housing area/unit, the foregoing contaminated lunch/food from their respective trays.

517.   That on March 3, 2015 and continuing, and at all relevant times herein mentioned, as a direct and proximate result of Plaintiff TYSEAN SAIGO consuming/eating the foregoing lunch meal that was ordered, cooked, prepared, distributed, plated, handed out, fed, provided and served by Defendants to Plaintiff TYSEAN SAIGO, to wit: meatloaf, bread, cabbage, corn, vegetables and/or juice that was provided and served to Plaintiff TYSEAN SAIGO in said Plaintiff's respective cell, Plaintiff TYSEAN SAIGO sustained and suffered serious personal and physical injuries including, but not limited to: headaches, nosebleeds, stomach pain, stomach cramps and stomach aches, mental anguish, shock, fear, emotional distress (intentional and negligent), psychological trauma, fear of dying, fear of physical bodily harm, anxiety and pain and suffering.

518.   That on March 3, 2015, and continuing for days thereafter, and at all relevant times herein mentioned, Plaintiff TYSEAN SAIGO made repeated requests for medical care and

treatment including but not limited to: being placed on sick call, medical testing to determine what was the contaminant n the foregoing lunch/food so as to determine the proper medical care to then be provided, testing of Plaintiff's blood and/or urine to identify what the contaminant was, and/or to be sent to an outside hospital/facility in order for his urine and blood to be tested in order to determine what the contaminant was so as to then receive the proper, timely and necessary medical care/treatment in order to treat same but, despite Plaintiffs' requests and despite knowing that Plaintiff TYSEAN SAIGO suffered from headaches, nosebleeds, stomach pain, stomach cramps and stomach aches, the Defendants denied/refused same requests.

519.     That as a direct and proximate result of being served to eat and eating the foregoing contaminated food that the Defendants served to Plaintiff on March 3, 2015 and becoming seriously ill as a direct and proximate result therefrom, Plaintiff TYSEAN SAIGO refused any food for the following several days thereafter and then was forced to only eat sealed food and/or kosher meals as he feared eating any food cooked, prepared, plated, served, handed out and or fed by the Defendants and feared becoming seriously ill and/or losing his life from same.

520.     That on March 3, 2015, and at all relevant times herein mentioned, Plaintiff TYSEAN SAIGO knew that the kitchen pantry officer for Plaintiff's housing area in AMKC was Defendant Thomas and, on March 3, 2015, because AMKC was placed on lockdown by the Defendants where they could not leave their respective cells, no inmate from Plaintiff's housing area was allowed to assist Defendant Thomas, as would normally be the practice, custom and policy of the Defendants, in the preparing, plating, serving, distributing and/or handing out of the meals to the inmates.

521.     That on March 3, 2015, Plaintiff TYSEAN SAIGO saw that it was Defendant Thomas who wheeled/pushed in the cart of food carrying the trays of the foregoing contaminated

food/lunch that was distributed and served to the Plaintiffs herein to consume and eat on same date of March 3, 2015 and that she had inmates from other housing unit/area assist her with same.

522.    That prior to March 3, 2015, Plaintiff TYSEAN SAIGO knew and/or learned from other inmates that Defendant Thomas does not like their housing area/unit and is always verbally fighting with the inmates including fighting with inmates the morning of March 3, 2015 before she served the foregoing contaminated lunch.

523.    That it is Plaintiff TYSEAN SAIGO's understanding that the only individual to have access to the foregoing contaminated lunch/meal for cooking, preparation and plating was Defendant Thomas and the inmates that she had assisting her with same on March 3, 2015 who were not form Plaintiffs' housing area/unit.

524.    That from March 3, 2015 and continuing, some of the Plaintiffs, including Plaintiff TROY SIDDONS, saved portions of the foregoing contaminated food/lunch from their respective trays despite Defendants and/or their agents, servants, employees and correction officers, who knew of this March 3, 2015 incident, coming to the Plaintiffs' cells, searching same and confiscating and throwing out the saved food that they found.

525.    That from March 3, 2015 and continuing, Plaintiff TYSEAN SAIGO saved some of the contaminated food from his March 3, 2015 tray, including some of the contaminated vegetables, but, on March 6, 2015, Defendants' corrections officers, names unknown to Plaintiff but known to Defendants, came to his cell, searched same, found said saved contaminated food and threw out same in front of Plaintiff TYSEAN SAIGO.

526.    That Plaintiff TROY SIDDONS told Plaintiff TYSEAN SAIGO, in sum and substance, that the correction officers who came to his (Siddons') cell on March 6, 2015 also

searched same and found some of his saved contaminated food and threw out what they had found in his cell.

527.    That it is Plaintiff TYSEAN SAIGO'S understanding that, subsequent to this March 3, 2015 incident, Defendant Feeney came to AMKC and meet with some of the Plaintiffs herein to interview them and that some of the Plaintiffs gave Defendant Feeney samples of the contaminated food/lunch so that the Defendants could test same.

528.    That it is Plaintiff TYSEAN SAIGO's understanding that other Plaintiffs provided a sample of their respective food to be tested by an outside independent laboratory and that to date, said samples were in fact, tested by an outside and independent laboratory which has confirmed that same, in fact, contained rat poison. See Exhibit "A", *supra*.

529.    That it is Plaintiff TYSEAN SAIGO's understanding that, to date, the sample provided to and possessed by Defendant Feeney has yet to be tested by the Defendants and/or that the Defendants are not in possession of the results of such testing conducting by and/or on behalf of the Defendants.

530.    That to date, Plaintiff TYSEAN SAIGO requests and demands herein that he be sent out to/transported to an outside hospital/medical facility in order to obtain the proper medical testing, care and treatment for having consumed rat poison on March 3, 2015 that was served to him by Defendants while Plaintiff was in the exclusive custody, care and control of the Defendants.

531.    That as Plaintiff TYSEAN SAIGO was denied the timely, proper and/or adequate medical care and testing by Defendant herein, as a direct and proximate result of the foregoing, the rat poison that Defendants caused him to consume on March 3, 2015 has been caused to go untreated and remain in his system thereby causing Plaintiff to fear and be unaware of the severity of same, of the effects of same and of the lasting and/or long term effects of same.